FILED
11/04/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 22, 2024

## STATE OF TENNESSEE v. GARY E. BROWN

**Appeal from the Criminal Court for Knox County**
**Nos. 122940, 125355          Hector Sanchez, Judge**

_____

**No. E2023-01562-CCA-R3-CD**

_____

Defendant, Gary E. Brown, was indicted by a Knox County Grand Jury in case number 122940 for aggravated assault by strangulation, domestic assault, false imprisonment, interfering with an emergency call, and two counts of violating a no contact order. Defendant was later charged by information in case number 125355 with domestic aggravated assault. In case number 122940, Defendant pled guilty to domestic assault and was sentenced to 179 days for which he had credit. In case number 125355, Defendant pled guilty to aggravated assault with an agreed-upon sentence of three years suspended to probation, with the trial court to determine after a hearing whether Defendant would receive judicial diversion. Following the trial court's denial of judicial diversion, Defendant appeals arguing that the trial court abused its discretion in denying judicial diversion. Following our review of the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Eric Lutton, District Public Defender; Jonathan Harwell, Assistant Public Defender (on appeal); Heather Bosau, Assistant Public Defender (at pleas and sentencing), Knoxville, Tennessee, for the appellant, Gary E. Brown.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Sean Roberts, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

This case stems from two separate domestic violence cases. On November 11, 2022, the Knox County Grand Jury returned a six-count indictment in case number 122940 ("domestic assault conviction") charging Defendant with aggravated assault by strangulation, domestic assault, false imprisonment, interfering with an emergency call, and two counts of violating a no contact order against Jeanette Marengo.[1] On May 3, 2023, while Defendant was on bond for the domestic assault conviction, he was arrested for aggravated assault against Janna Ogle.

Following Defendant's May 3, 2023 arrest, the State filed a motion to revoke or increase Defendant's bond for the domestic assault conviction, and the trial court conducted a hearing on the motion on May 30, 2023. Defendant announced at the hearing that he agreed to the revocation of his bond with the understanding that both cases would be set for a plea hearing date. However, the trial court increased Defendant's bond to $1,000,000. Both cases were then set for a plea hearing on June 7, 2023.

At the June 7, 2023 plea hearing, the trial court rejected a proposed plea agreement wherein Defendant would plead guilty to domestic assault for the domestic assault conviction and aggravated assault in case number 125355 ("aggravated assault conviction") and ordered Defendant to serve a "one-year sanction" after which it would reconsider the proposed plea agreement. On June 26, 2023, Defendant filed a Motion to Reconsider Court's Decision to Reset Plea Date, arguing that the trial court "did not follow the appropriate procedure in either accepting or rejecting the plea," abused its discretion in "reserving judgment . . . and setting the case out to 2024," and that Defendant's speedy trial rights were "on the periphery of the actions taken by" the trial court.

At a hearing on that motion on July 7, 2023, the trial court stated that it had incorrectly rejected the plea agreements at the prior hearing and advised Defendant that he could withdraw his guilty pleas pursuant to Tennessee Rule of Criminal Procedure 11(c)(5). Defendant chose to not withdraw his pleas. The State then announced that for the domestic assault conviction, Defendant agreed to plead guilty to domestic assault in exchange for receiving a "time-served sentence at the . . . sentencing hearing" and the remaining counts being dismissed. Regarding the aggravated assault conviction, Defendant agreed to plead guilty by information to aggravated assault with a "three-year

---

[1] At Defendant's sentencing hearing, Ms. Marengo indicated that her last name was "Marengo-Jimenez." For clarity, we will use Ms. Marengo's name as it appears in the indictment.

sentence with . . . six months split confinement."[2]  As a condition of the pleas, Defendant would be ordered to have no contact with Ms. Ogle and Ms. Marengo.  The State announced it would oppose Defendant's application for judicial diversion.  The State presented the following factual basis for Defendant's plea in the domestic assault conviction:

> On January 23 of 2022, Jeanette Marengo and [D]efendant were at . . . Apartment 402, when they were in an argument that escalated when [D]efendant shoved Ms. Marengo to the floor.
>
> When she got up, [D]efendant shoved her to the ground a second time.  Ms. Marengo ran in the kitchen and [D]efendant pursued her.  She threw a packaged frozen dinner at him, and [D]efendant retrieved a vacuum cleaner and struck Ms. Marengo in the back with it.  Defendant then left the apartment.
>
> Shortly after that, [D]efendant returned to the apartment.  Ms. Marengo asked [D]efendant to leave.  Defendant struck Ms. Marengo in the face with an open hand and attempted to choke her, when [D]efendant grabbed Ms. Marengo by the neck.
>
> . . . .
>
> Defendant admitted to officers that he shoved Ms. Marengo to the floor twice and struck her with the vacuum cleaner.  Defendant was taken into custody, and the proof would show that all those events occurred in Knox County, Tennessee.

Regarding the aggravated assault conviction, the State announced if the case went to trial, it anticipated that the proof would show the following:

> As the proof at [D]efendant's bond revocation hearing on May 30th, 2023 [for the domestic assault conviction] showed that on May 3rd, 2023, [D]efendant was driving his red Nissan sedan with Janna Ogle in the passenger seat.

---

[2] At the October 26 diversion hearing, the trial court and the parties agreed that the judgment should reflect a "pre-plea credit" rather than reflect six months' confinement so that Defendant remained eligible for judicial diversion.  *See* T.C.A. § 40-35-313(a)(1)(B)(iii)(b) (stating that "reasonable conditions" includes requiring a qualified defendant to serve not more than thirty days' confinement in the local jail).

They started arguing about [D]efendant being late to a hair appointment and [D]efendant raised his voice at her. Janna Ogle, demanded [D]efendant stop the vehicle so she could get out. [D]efendant stopped the vehicle in the East Town Mall area of Knoxville by Sam's Club.

Defendant threw Ms. Ogle's sunglasses out the vehicle window. Ms. Ogle got out of the vehicle, walked away. Ms. Ogle was walking in the grass about [ten] to [fifteen] feet off the road. Defendant placed his vehicle in reverse to [] point the front end of the car at Ms. Ogle.

[D]efendant drove into Ms. Ogle while she was walking on foot. Middle of the front end of [D]efendant's vehicle made contact with Ms. Ogle, causing Ms. Ogle to roll over the hood and the windshield briefly launching Ms. Ogle into the air.

The vehicle initially made contact with Ms. Ogle's left hand when it was against her hip, causing a fracture of three bones in Ms. Ogle's hand and arm. Ms. Ogle also suffered abrasions on her face when she landed on the ground after being launched in the air by [D]efendant's vehicle. [D]efendant sped away and drove back to the area after some time.

Chloe Brock was in the area when she observed [D]efendant's red Nissan stopped, and witnessed [D]efendant arguing with Ms. Ogle. Chloe Brock stopped her vehicle and make sure everything was okay when she observed Ms. Ogle exit [D]efendant's vehicle, walk [a]way.

Chloe Brock observed [D]efendant back his vehicle up to align with Ms. Ogle, and observed [D]efendant drive his vehicle [into] Ms. Ogle and as she testified in the previous hearing on May 30th, she witnessed Ms. Ogle being launched approximately [ten] feet into the air after [D]efendant hit her with her car. 911 was called and KPD officers responded.

Officers observed damage to the hood of [D]efendant's vehicle after he had returned to the scene. Officers observed Ms. Ogle to have wrapped her left hand and arm in her T-shirt and Ms. Ogle appeared to be in pain.

Officers also observed abrasions and redness to the side of Ms. Ogle's face. Ms. Ogle went to the hospital the next day where it was discovered that she had fractures in three places in her left arm and hand. And the proof would show that all these events occurred in Knox County Tennessee.

Defendant agreed to the facts as announced by the State and following the plea colloquy, the trial court accepted the plea agreements, but withheld entry of judgments until the diversion hearing.

At the October 26, 2023 diversion hearing, the State introduced Defendant's presentence report which showed that Defendant had no prior criminal history. Defendant reported his mental and physical health as "fair"; he had been diagnosed with ADHD as a child but was not on medication at the time of the report. Defendant reported social use of alcohol and marijuana. The validated risk and needs assessment resulted in a risk score of "moderate" with high needs in mental health, moderate needs in education, residential, attitudes/behaviors, family, and aggression, and low needs in alcohol/drug use, employment, and friends.

Linda Brown, Defendant's sister, testified and described Defendant as the "definition of a good big brother[,]" "mild-headed[,]" and "motivating." Defendant had helped her and was a "shining light" while she recovered from an amputation after a car accident. Jamar Hensley, Defendant's childhood friend, testified that Defendant was his "best friend because he's that person that's always there for [him] no matter what." Joseph Slack met Defendant in 2016 when they played semi-professional football together. Mr. Slack said that Defendant was "like [his] little brother" and described Defendant as "a kind-hearted person that wouldn't hurt a fly." Heather Chism met Defendant in 2015 or 2016. She described Defendant as a "family person, love[s] everything that he does, [and a] very kind-hearted person." All of the witnesses were aware of the facts underlying Defendant's convictions and said they would act as a support system for Defendant.

Defendant then introduced two academic reports regarding the benefits of expungement and the collateral consequences of permanent convictions. Defendant further introduced certificates of completion from the Corrections Rehabilitation Institute for the Entrepreneurship, Anger Management, Behavior Change, and Family and Community Reunification programs.

Ms. Marengo provided a victim impact statement explaining that she had "been in and out of therapy" and that the incident had impacted her "mentally, emotionally, physically, spiritually, and financially." Since the assault, Ms. Marengo had experienced increased "anxiety and panic attacks" and had trouble maintaining relationships. She explained that the incident had impacted her son because she no longer had transportation, and Defendant had "practically" raised her son.

Defendant offered an allocution. He stated that the six months he spent incarcerated were the "hardest thing of [his] life." Defendant wanted to continue his education and become a football coach, and he expressed that he was disappointed in himself. He

explained that he lost someone and kept "stuff . . . bottled up instead of taking care of it[.]" Defendant understood that he "put [him]self in this situation" but said it was important to him to have a "clean record" because he did not want the "doors . . . to shut[.]" He stated that he did not "want to ever have to come back here again."

The State asserted that judicial diversion was inappropriate in both cases because of the nature and circumstances of the offense, the need for deterrence for Defendant, and because the interests of the public weighed heavily against granting judicial diversion. The State noted that Defendant committed the aggravated assault against Ms. Ogle while on pretrial release for the domestic assault against Ms. Marengo. The State asserted that "[m]ainly, with the circumstances of the offense especially in the subsequent case . . . [D]efendant had no hesitation before committing an act that could have resulted in the loss of human life or serious bodily injury."

Defendant argued that his lack of criminal history, strong social support, and his amenability to correction, as evidenced by his certificates earned while incarcerated, weighed strongly in favor of judicial diversion. He acknowledged that the circumstances of the offense "likely does not weigh in his favor" but noted that he had accepted responsibility by pleading guilty to both offenses. Defendant stated that he had willingly met with a social worker and that the results of that assessment indicated that he would benefit from mental health treatment, which could be handled in the community. He asserted that the deterrent effect had already been felt by Defendant, and the general deterrence would be minimal because the cases had not garnered public attention. He further asserted that diversion would not "send a message that crimes against women are not taken seriously" because Defendant had spent the prior six months incarcerated and would continue to experience the consequences of the convictions. Defendant, relying on the academic reports, argued that judicial diversion would serve the interests of the public by reducing the collateral consequences of conviction, such as limited access to employment, housing, and public assistance.

Pursuant to the plea agreements, the trial court sentenced Defendant to three years on state probation for the aggravated assault conviction and time served for the domestic assault conviction and ordered Defendant to undergo an alcohol and drug assessment, to follow any recommended treatments, and to have no contact with either Ms. Ogle or Ms. Marengo. The trial court found that Defendant was qualified for judicial diversion and then considered and weighed the factors in *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). The trial court found that Defendant's amenability to correction and lack of criminal history weighed in favor of judicial diversion and stated that Defendant appeared to be "genuine and sincere" regarding taking responsibility and being remorseful. The court expressed its belief that Defendant was "someone who has on a couple of occasions departed from their normal course of conduct and engaged in conduct

that kind of led [him] to where [he] is today." After recounting the witnesses who testified on Defendant's behalf, the trial court found that Defendant's social history favored diversion, noting that Defendant had "made some extraordinarily bad decisions that very well, as I stated in your plea, could have ended in a homicide charge. I mean if that girl, Ms. Ogle, landed incorrectly and broke her neck, we'd be hearing a whole different situation. You'd be looking at a lot more time." Regarding the circumstances of the offense, the trial court found:

> The second factor is the circumstances of the offense and that's really what the biggest problem for you is here, . . . is that you were on bond for a violent offense against . . . somebody you were intimately involved with[.]

> You were on bond after you strangled [Ms. Marengo], and then while you're on bond, you got into another fight with Ms. Ogle, and I don't know what got the best of you or for whatever reasons you decided that when she left the car that you were going to accelerate at her and hit her with your motor vehicle.

> And I think the witnesses testified if I recall correctly that she looked like a rag doll going through the air before she ultimately fell and broke three bones in her arm. So that's, that's the circumstances of both of those offenses weigh heavily against granting judicial diversion in this case.

The trial court gave "not much" weight to Defendant's mental and physical health because Defendant appeared to "be in good mental health as well as physical health" although being in custody had "drained him[.]" The trial court noted that:

> there's no question [judicial diversion] would serve the interest of [Defendant] having a clear record, obviously. [Defendant] cited to some research and data and articles that support the fact that a clean record does go a long way and folks who do get the benefit of diversion tend to do better with regard to recidivism.

> But . . . the other half to that inquiry is whether judicial diversion will serve the interest of the public, and that's really to basically not put the public on notice that on two occasions you acted extremely violently towards women. One occasion you armed yourself with a vehicle and hit that person, and that's the biggest hurdle for this [c]ourt to overcome is the circumstances of the offenses.

Had it been one offense. I think you would have a great argument for judicial diversion. The [c]ourt probably would place you on diversion. But given the circumstances that you were on bond for the first and you committed the second and you kind of progressed with regard to your conduct and seriously put a human being in peril of death or serious bodily injury, the [c]ourt does make a finding that you are not an appropriate candidate for judicial diversion.

Defendant's timely appeal is now before this court.

**Analysis**

Defendant argues that the trial court erred in denying judicial diversion because it based its denial on the potential injuries that Ms. Ogle could have suffered and a "flawed" argument that the public's interest would be served by denying diversion. The State asserts that the trial court properly weighed the *Electroplating* factors, and did not abuse its discretion in denying judicial diversion based on the circumstances of the offense and the interests of the public. We agree with the State.

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A); *State v. Dycus*, 456 S.W.3d 918, 925 (Tenn. 2015). A qualified defendant is one who is found or pleads guilty to the offense, is not seeking deferral for certain sexual offenses or an offense committed by an elected or appointed person, has not been previously convicted of a felony or Class A misdemeanor, and has not previously been granted judicial or pretrial diversion. T.C.A. § 40-35-313(a)(1)(B)(i)(a)-(e). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. T.C.A. § 40-35-313(a)(2), (b); *Dycus*, 456 S.W.3d at 925. As an offender convicted of the Class A misdemeanor of domestic assault and the Class C felony of aggravated assault, with no prior criminal record, Defendant's criminal history and convictions met the statutory requirements for eligibility for judicial diversion. *See* T.C.A. § 40-35-313(a)(1)(B).

Mere eligibility for judicial diversion, however, does not entitle a defendant to judicial diversion. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In determining whether to grant diversion, the trial court must consider the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether

judicial diversion will serve the interests of the public as well as the accused. *Electroplating*, 990 S.W.2d at 229.

The decision to grant or deny a qualified defendant judicial diversion "is entrusted to the discretion of the trial court." *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citation omitted). This court will apply a presumption of reasonableness to a trial court's decision regarding judicial diversion so long as the trial court considers the *Electroplating* factors, identifies the relevant factors, and explains on the record the reasoning for its decision. *Id.* at 326 (citing *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012)). In doing so, this court will uphold a trial court's decision denying or granting judicial diversion so long as there is "any substantial evidence to support the trial court's decision." *Id.* "'Substantial evidence' is '[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla.'" *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting BLACK'S LAW DICTIONARY 640 (9th ed. 2009)). A trial court is "not required to utilize any 'magic words' or specifically reference the case names . . . when discussing the relevant factors in order to receive the presumption of reasonableness." *King*, 432 S.W.3d at 324 n.8.

While the procedural history in this case is confusing and the record is somewhat unclear, it appears that Defendant sought judicial diversion, and appeals the denial of diversion, in both cases. The trial court specifically considered the *Electroplating* factors and analyzed each in turn when providing its reasoning for denying Defendant's request for judicial diversion; thus, we will apply a presumption of reasonableness to the trial court's denial of judicial diversion.

The trial court found that Defendant's lack of criminal history and social history weighed in favor of granting diversion and placed minimal weight on Defendant's "good" physical and mental health. The court also found that Defendant was amenable to correction, noting that he appeared to be genuinely remorseful for his actions. However, the trial court found that the circumstances of the offense weighed strongly against diversion because Defendant committed the offense underlying the aggravated assault conviction while he was on bond for the domestic assault conviction. The trial court noted that Defendant had "progressed" in violence, and struck Ms. Ogle with a car, putting her "in peril of death or serious bodily injury" based on Ms. Brock's testimony that Ms. Ogle flew ten feet before landing on the ground. The trial court addressed Defendant's interests in receiving judicial diversion and considered the academic research presented at the sentencing hearing; however, it found that the public's interest in being aware of Defendant's repeated and escalating violence against women outweighed Defendant's interest in receiving diversion.

- 9 -

Defendant argues that the trial court violated the "basic principle" that a defendant's punishment shall be "justly deserved in relation to the seriousness of the offense" by relying "on the facts that Ms. Ogle *could have been* more seriously harmed." *See* T.C.A. § 40-35-102(1). He asserts that there was no evidence to support the theory that Ms. Ogle could have broken her neck, and it was "inappropriate to make sentencing decisions on the basis of speculation as to things that did not happen." Regarding this issue, the trial court stated:

> So I think your social history supports the fact that ultimately . . . you're a good person.

> You made some extraordinarily bad decisions that very well, as I stated in your plea, could have ended in a homicide charge. I mean if that girl, Ms. Ogle, landed incorrectly and broke her neck, we'd be hearing a whole different situation. You'd be looking at a lot more time.

When the trial court's statement is considered in the context of its analysis and ruling, it is clear that the trial court did not actually consider the potential for harm as a diversion factor, but commented on the circumstances of the offense, noting that Defendant had made a bad decision that could have been much worse, despite his positive social history.

Further, because the trial court did not deny diversion based solely on the circumstances of the offense, it was not required to find that the circumstances were "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (concluding that the higher standard of review is inapplicable in cases where the denial was based on more than one factor); *see State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006). In addition to relying on the circumstances of the offense in its denial of diversion, the trial court also relied on the fact that Defendant committed the offense against Ms. Ogle while on bond for his assault against Ms. Marengo, noting that Defendant "progressed" in his conduct. *See State v. Jackson*, No. E2009-00852-CCA-R3-CD, 2010 WL 1949147, at *4 (noting that our legislature has expressed disfavor for those committing offenses while on bond to support a trial court's consideration of the same in denying diversion); *State v. Myers*, No. E2021-00841-CCA-R3-CD, 2022 WL 2903266, at *10 (Tenn. Crim. App. July 22, 2022) (noting that the trial court properly considered under the circumstances of the offense that the offense "exceeded a mere attempt to elude arrest and could easily have led to the death of the [d]efendant or the victim").

Defendant next contends that the trial court relied on a "flawed" public safety argument when determining that judicial diversion would not serve the interests of the

public. He contends that "there is no easy mechanism by which women that [Defendant] encounters will automatically become aware of his conduct due to the fact that he has a conviction." The State asserts that the public's ability to become aware of a Defendant's convictions is relevant to whether judicial diversion would serve the interests of the public.

The interests of the public "may not be served where granting diversion would depreciate the seriousness of the offense, or where the collateral consequences of a conviction would protect the public[.]" *State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *11 (Tenn. Crim. App. Apr. 12, 2023) (citations omitted). It may be in the public's interest to have a conviction remain on a defendant's record. *State v. Allen*, No. W2021-00673-CCA-R3-CD, 2022 WL 842642, at *10 (Tenn. Crim. App. Mar. 22, 2022) (upholding trial court's finding that the public's interest was served by a permanent conviction to prevent the defendant from obtaining employment around children where he could re-offend); *see State v. Lampkin*, No. W2019-00885-CCA-R3-CD, 2020 WL 1875238, at *5 (Tenn. Crim. App. Apr. 15, 2020) ("The denial of diversion was based on the trial court's determination that the interests of the public weighed in favor of making it impossible for the [d]efendant to return to teaching, regardless of his current intentions. We conclude that this did not constitute an abuse of discretion.").

Defendant relies on *State v. Hatfield*, No. E2018-00041-CCA-R3-CD, 2019 WL 91542, at *4 (Tenn. Crim. App. Jan. 3, 2019) in support of his position. In *Hatfield*, the defendant pled guilty to aggravated assault by strangulation in exchange for a three-year sentence with the manner of service to be determined by the trial court. *Id.* at *1. The trial court denied judicial diversion based on the circumstances of the offense, specifically noting how dangerous strangulation was, the deterrence value to the accused and others, and the interests of the public. *Id.* at *2. Noting that it was not "satisfied that the interest of the public would be served if it were impossible to find out about this episode and this damage to this woman in this domestic context," the trial court found that the interests of the public were served by denying judicial diversion. *Id.* A majority of a panel of this court found this improper:

> The trial court indicated that it did not believe diversion to be appropriate because the public in general, and any future potential romantic partner of the defendant, should be aware that the defendant had committed the offense of aggravated assault against his girlfriend. The legislature, however, has seen fit to make aggravated assault by strangulation, even of one's romantic partner, an offense eligible for judicial diversion. Consequently, the fact of the defendant's having committed that offense cannot support a denial of judicial diversion.

*Id.* at *4. Here, however, while noting that part of the inquiry of "serving the interests of the public" is to "put the public on notice that on two occasions you acted extremely violently towards women," the trial court specifically noted that it was the repeated and escalating nature of Defendant's conduct underlying the convictions that the public had an interest in being able to discover. In fact, the trial court stated that it likely would have granted diversion had there only been one assault case against Defendant.

Because the trial court properly considered the *Electroplating* factors and the record contains substantial evidence in support of its findings, we conclude that the trial court did not abuse its discretion when it denied diversion. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 12 -